UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

BRASSCO, INC.                                          :

                    Plaintiff,                          :        99 Civ. 3014   (PAC)

        - against -                                     :        <u>OPINION AND ORDER</u>

ANDRZEJ KLIPO and BEATA KLIPO.                          :

                    Defendants.                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

        HONORABLE PAUL A. CROTTY, United States District Judge:


        The plaintiff Brassco, Inc. ("Brassco"), a New York corporation, was in the

business of marketing and trading in non-ferrous metals, non-ferrous metal semi-products, steel,

and brass ball bearings.  Brassco filed this action on April 26, 1999 against defendants Andrzej

Klipo ("Klipo") and his wife, Beata Klipo ("B. Klipo") (collectively, "the Klipos").  Klipo

served as an officer of Brassco from October 1992 until July 1998; Klipo's wife was employed

at Brassco as a secretary.  Brassco asserts claims based on diversity for fraud, breach of contract,

breach of fiduciary duty, breach of the duty of loyalty, misappropriation, conversion, and prima

facie tort in connection with losses incurred from agricultural transactions, which Brassco

claimed the Klipos had engaged in without authorization.  Brassco seeks an accounting,

damages, costs, attorneys' fees, prejudgment interest, and punitive damages.

        Following a bench trial, and for the reasons stated below, the Court finds that

Beata Klipo is not liable to Brassco and that Andrzej Klipo is liable to Brassco in the amount of

$340,891.70 plus prejudgment interest (as set out in Schedule A appended to this Opinion and

Order) for fraud, breach of contract, and breach of the duty of loyalty because of his illicit

transactions and for taking kickbacks from one of his trading partners. Klipo must pay over the kickbacks and forfeit his salary during the period in which he received kickbacks.

**THE TRIAL**

In accordance with the Individual Practices of this Court in civil bench trials, the parties submitted pretrial memoranda of law. A pretrial conference was held on December 2, 2005. The Court conducted a bench trial, which began on December 12, 2005 and concluded on December 15, 2005. The parties also submitted post-trial memoranda of law. The Court's findings of fact and conclusions of law are set out below.

**THE FACTS**

**I.      Stipulated Facts**

The parties stipulated to the following facts in their Joint Pre-Trial Order dated December 8, 2005. Brassco is a New York corporation organized on July 16, 1992. The shareholders of Brassco include Impexmetal S.A. ("Impexmetal"), a former Polish state-owned enterprise, and Hutmen S.A. ("Hutmen"), also a former Polish state-owned enterprise. Since 1997, Impexmetal and Hutmen, both, have been converted to public stock companies organized under the laws of Poland. Impexmetal owns 94% of Brassco's shares and Hutmen owes 6%. At all relevant times, Brassco was in the business of marketing and trading in non-ferrous metals, non-ferrous semi-products, and brass ball bearings. Brassco's board of directors consisted of two directors, who held senior positions at Impexmetal and resided in Poland.

In 1987, defendant Klipo started working for Impexmetal as a salesman and trader and, eventually, was promoted as a senior salesman and trader. In 1992, Impexmetal selected Klipo to work at Brassco in New York. Klipo and Impexmetal entered into an employment

agreement dated July 1, 1992.  Klipo and Brassco entered into a separate employment agreement on October 6, 1992, under which agreement Klipo was named vice-president of Brassco.  Klipo was promoted to president and treasurer of Brassco and served in that capacity from July 1, 1994 until July 31, 1998 pursuant to a third employment agreement dated July 1, 1994.  The agreement stipulated a term of three years (beginning on July 1, 1994 and ending on April 15, 1997) and provided for an annual salary of $65,000.  The parties renewed the employment agreement for an additional period beginning on April 2, 1997 and ending on July 16, 1998 for an annual salary of $70,000.  In all, Brassco employed Klipo from August 1, 1994 until July 31, 1998.  On September 9, 1997, Impexmetal informed Klipo via facsimile that his employment as president and treasurer of Brassco would terminate as of July 1, 1998 and that Pawel Traczyk ("Traczyk") would succeed him as president of the company.

From August 1995 until July 31, 1998, Klipo, using Brassco's facilities and credit, purchased foodstuffs from American companies, which it exported to three foreign corporations:  Intertec Trading of Ontario, Canada ("Intertec"), Marius FT of Wroclaw, Poland ("Marius FT"), and Alama of Wroclaw, Poland ("Alama") (the "Foreign Companies").  On December 19, 1997, Klipo caused Brassco to enter into a contract with Red River Commodities for delivery of red kidney beans on a monthly basis between January, 1998 and July, 1998.

Brassco obtained a judgment in Wroclaw, Poland, against Marius FT in the amount of $105,000 U.S. for nonpayment of various invoices for foodstuffs transactions.

Brassco's certificate of incorporation and by-laws contained no restrictions on the trading activities in which Brassco could engage and no express prohibition against trading in agricultural products.[1]

## II.    The Parties' Contentions Regarding Facts in Dispute

### A.    Brassco's Contentions

Brassco contends that the agricultural transactions in which Klipo engaged were undisclosed and unauthorized. Brassco maintains that, during all relevant times, it and its parent company, Impexmetal, had clearly demarcated and narrowly defined lines of business involving the marketing and trading of non-ferrous metals, metal semi-products, steel, and brass ball bearings. Klipo's agricultural trades were, thus, wholly outside of Brassco's main lines of business.

Brassco also asserts that Klipo was a trusted, experienced, well-trained businessman with expertise in international transactions involving metals and, more particularly, in the secure financing of such transactions. Brassco claims that except in dealing with well-known companies or with traders with whom the company had a well-established history, customary business practices would have required stringent controls on international trading transactions, including thorough credit checks and prepayment, lines of credit or bank guarantees by the ultimate buyers. Brassco maintains that Klipo's agricultural trades fell so far short of these business standards and customary practices as to constitute "business negligence."

According to Brassco, the agricultural trades had a crippling effect on the company's economic well-being. Klipo promptly paid the foodstuffs' sellers but waited long

---

[1]    The parties stipulated to this fact during the trial (Trial Tr. vol 2, 202, Dec. 13, 2005).

periods of time for payment from the three ultimate buyers with whom he traded; in some instances, Klipo never received payment. Although the agricultural sales comprised a relatively small percentage of the company's total sales in 1996 and 1997, they accounted for over two-thirds of the company's working capital. These trades, thus, froze Brassco's capital, resulted in net operating losses, and prevented Brassco from engaging in its main lines of business, particularly during a time of very favorable market conditions.

With regard to the Red River Commodities trades, these involved Marius FT exclusively and occurred from January, 1998 to July, 1998. Mariusz Chrzan was the principal owner of Marius FT. Brassco contends that these trades constituted, at best, an interest-free loan from Brassco to Chrzan and, at worst, misappropriation because Klipo knew that Chrzan had no intention of paying Brassco. Brassco stresses the fact that Klipo permitted the deliveries to continue notwithstanding Marius FT's mounting debts. The *coup de grâce* for Brassco, however, was money Klipo received from Chrzan into his personal bank account in Poland; these payments, Brassco contends, were kickbacks for the funds which Klipo advanced to Chrzan.

### B.    The Klipos' Contentions

Klipo contends that the agricultural transactions were authorized and disclosed. Klipo alternately maintains as follows: that he decided to engage in the agricultural transactions but that he was under no obligation to disclose them; that former Brassco director Slawomir Masiuk ("Masiuk") encouraged Klipo to widen the types of trades in which Brassco engaged and that Masiuk sanctioned these transactions; and, that Klipo approached Brassco's directors because Brassco had difficulty in obtaining lines of credit from American banks and that the

directors along with Klipo agreed that Brassco should trade in foodstuffs. Klipo maintains that, at various times, he discussed the agricultural trades with Brassco directors, Impexmetal personnel, Brassco's accountant and bookkeeper and, in particular, that the trades were mentioned during annual shareholder meetings.

Klipo emphasizes the fact that none of the transactions were concealed. For instance, Klipo left behind binders with invoices and bills of lading relating to the agricultural trades. Klipo also notes that Impexmetal personnel covered Brassco's offices and operations during his vacations and had complete access to all records. Brassco's directors also had complete access to all of the company's records and operations at all times. Klipo also claims that he never withheld any document requested or refused to answer any question posed by Brassco's directors and bookkeeper.

With regard to the financing of the agricultural trades, Klipo asserts that Brassco frequently traded with other companies on "open accounts" and that all of these trades involved unsecured financing. Klipo stresses the fact that he checked Marius FT's credit references and that the first trade with that company involved only one delivery of a small quantity of product. Klipo contends that, given the fact that Marius FT made all the necessary payments involved in the initial trades, the subsequent transactions for more substantial monthly deliveries were reasonable and legitimate. Klipo also claims that, once Marius FT stopped making payments, he tried to find other buyers for the foodstuffs but failed to do so.

Finally, with regard to the Chrzan payments into his bank account, Klipo states that these constituted repayment for electronics and other products, which Klipo bought for Chrzan and which he either personally delivered or had delivered to Chrzan in Poland. Klipo

explains the fact that the deposits were made in round numbers by stating that Chrzan repaid him the total amount owed in installments.

III.     Findings of Fact

      A.     Brassco's Main Lines of Business and Trading Customs

Brassco is one of a number of subsidiaries owned by Impexmetal and part of Impexmetal's international sales network (Trial Tr. 28).  In addition to the United States, this network includes companies located in France, Germany, Austria, Belgium, and Singapore, which trade throughout Europe and Asia. Id.  Impexmetal established Brassco in 1992 in order to promote the sale of Polish non-ferrous semi-products and brass ball bearings in Canada (Trial Tr. 30) and the United States and also to take advantage of the more favorable interests rates available in the United States at that time in comparison with those in Poland (Trial Tr. 31).

Impexmetal's network of companies had well-established practices and customs related to the international transactions in which they engaged when exporting Impexmetal goods (Trial Tr. 35).  These companies entered into contracts with buyers (Trial Tr. 35) whereby the most preferred financing method involved prepayment of goods (Trial Tr. 36), the second most preferred method involved bank guarantees (Trial Tr. 38), and the third most preferred method involved letters of credit (Trial Tr. 36-37, 39).  These transactions, which customary business practices at Impexmetal and its subsidiaries required to be secured, typically involved documents such as contracts, product specification certificates, shipping instructions, bills of lading, bills of inland transportation, purchase invoices, and sale invoices (Trial Tr. 39). Salesmen and traders at Impexmetal and throughout its international network, including defendant Klipo, received training and supervision in international transactions and in the most

secure methods of financing as part of their education and on-the-job instruction (Trial Tr. 40-42; Walarowski Dep. 52:8-10).

During the relevant time period, Impexmetal dealt exclusively with metal products. The company was organized into departments dealing with aluminum, copper semi-products, zinc, other metals (such as nickel and tin), steel, and brass ball bearings (Trial Tr. 45). Although Impexmetal is a minority shareholder in a company called Sinemex, which is located in Singapore and Vienna and which trades in non-ferrous metals, electronics, and some agricultural products (Trial Tr. 29), in all other regards the company's main lines of business were non-ferrous metals, steel, and ball bearings (Trial Tr. 45). Brassco's main lines of business, like those of Impexmetal, dealt with metal products only: nonferrous metal products, nonferrous metal semi-products, steel, and brass ball bearings (Trial Tr. 66, 165, 284-85, 380; Walarowski Dep. 19:17-19; Pawlowski Dep. 91:9-17).

No written documents stipulated that Brassco's main lines of businesses were limited to these products (Walarowski Dep. 19:5, 49:2; Pawlowski Dep. 89:18-90:5). The scope and focus of business, however, at both Impexmetal and Brassco was obvious to traders and other senior personnel involved in the companies (Walarowski Dep. 19:9-12, 57:8-12; Pawlowski Dep. 89:8-13) and discussed among the board and company personnel (Walarowski Dep. 49:2-8). Moreover, for an Impexmetal subsidiary, even trading with companies located outside of the home country and in metals other than those in that subsidiary's established lines of business would have been considered extraordinary and would have required board authorization (Walarowski Dep. 46:12-48-20).

## B.     Brassco's Management Structure, Business Practices, and Operations

As noted previously, Brassco had a board of directors comprised of two senior Impexmetal managers; Klipo also attended the board meetings (Pawlowski Dep. 139:2-6). Prior to and during Klipo's tenure, three Impexmetal senior managers served as directors of Brassco's board of directors. Starting in 1992, Krzysztof Walarowski ("Walarowski") served on Impexmetal's managing board and as its commercial director (Trial Tr. 43; Walarowski Dep. 8:8-12); Walarowski served as a Brassco board director from 1992 until November, 1998 (Walarowski Dep. 7:23-8:2, July 25, 2002; Pawlowski Dep. 54:3-5, July 22, 2002). A second director was Slawomir Masiuk ("Masiuk"), who resigned from the Brassco board in 1995 (Trial Tr. 44) or 1996 (Walarowski Dep. 11:10-18). Masiuk was replaced by a third Brassco director, Jerzy Pawlowski ("Pawlowski") (Walarowski Dep. 11:16-18), who also served as the manager of Impexmetal's metals department (Trial Tr. 44).

Brassco's by-laws provided for annual meetings of the shareholders and of the board of directors (Trial Ex. 1, ¶¶ II(2), III(10)) and Brassco's directors traveled to New York to attend these meetings (Walarowski Dep. 8:15-16, 12:11; Pawlowski Dep. 138:20-22). The by-laws stated that the president of the corporation: "shall be the chief executive officer of the [c]orporation; he shall be entrusted subject to the provision of these [b]y-[l]aws with the management of the business and affairs of the [c]orporation and shall see that all orders and resolutions of the shareholders are carried into effect." Id. ¶ IV(3). The by-laws obligated the treasurer of Brassco, among other duties, to "keep full and accurate accounts of receipts and disbursements in the corporate books," id. ¶ IV(6)(b), and "to render to the shareholders at the meetings of the shareholders . . . an account of all his transactions as treasurer and of the

financial condition of the [c]orporation." Id. ¶ IV(6)(e).  Under the by-laws, the president had the authority to enter into contracts and sign checks, demands for money, notes, and negotiable instruments to conduct any corporate action "in the normal course of business." Id. ¶ V(2).

Klipo's employment agreements with Brassco required Klipo to work in accordance with the duties and obligations set forth in the by-laws and as well to "use his best efforts to promote the business and interests" of Brassco (Trial Ex. 2, ¶ 3; Trial Ex. 3, ¶ 3).

Impexmetal's senior managers and Brassco board directors received regular reports from Brassco.  For example, Brassco retained the accounting firm of Ellenoff and Goldin to perform accounting and bookkeeping services beginning in 1992 (Trial Tr. 314) and Impexmetal received, among other reports, monthly income statements (Trial Tr. 235; Walarowski Dep. 54:24-25; Pawlowski Dep. 76:7-77:10).  Bertram Goldin ("Goldin") prepared these monthly income statements by reviewing Brassco's ledger, sales journal and purchase journal (Trial Tr. 297).  Goldin also prepared annual balance sheets (Trial Tr. 307) and financial statements (Trial Tr. 320; Walarowski Dep. 12:11).  It was Goldin's practice to record Brassco's two main lines of business, *i.e.,* brass ball bearings and metals, separately in the financial statements (Trial Tr. 305).  Goldin testified that the financial reports analyzed the ball bearing business separately because that was the proper accounting practice (Trial Tr. 296, 303, 305).

Goldin did not perform audits for Brassco (Trial Tr. 292).  Rather, Goldin conducted compilations and reviews of the company's finances (Trial Tr. 291), for which he only examined the books (Trial Tr. 291-92).  While Goldin checked the purchase journal and the sales journal and invoices, he did not check all of them and never saw an invoice involving

foodstuffs (Trial Tr. 292-93). He testified that he had full access to all the books and records and that Mr. Klipo would answer all of his questions.

During Klipo's four years with Brassco, Goldin never found the foodstuffs transactions (Trial Tr. 300-01) and never reviewed any documents showing that Brassco was dealing in foodstuffs (Trial Tr. 300, 343). Given the limited number of transactions Brassco engaged in on a monthly basis, Goldin's explanation that he never saw an invoice involving foodstuffs is puzzling. For example, the sales journal for April 1996 reflected only ten transactions, of which two of them involved foodstuffs (Trial Tr. 338-39). Given the applicable accounting standards, however, Goldin was not called upon to check every single invoice (Trial Tr. 336-37, 338), and perhaps he missed these invoices. On the other hand, Klipo never told Goldin about these transactions and, so far as Goldin could gather, the foodstuffs transactions were not discussed at annual meetings.

Goldin, thus, testified that Klipo never informed him of any agricultural transactions (Trial Tr. 294, 305, 309, 354-55). Goldin also attended part of the annual shareholder meetings to present the financial statements and never heard any mention of foodstuffs transactions (Trial Tr. 306-07). Goldin first learned about these transactions from Traczyk (Trial Tr. 300). Had Goldin known about the foodstuffs trades, these transactions would have been reported as a separate line of business in the monthly and annual balance sheets and financial statements (Trial Tr. 305, 310, 340).

### C. Klipo's Tenure at Impexmetal and Brassco and Notice of His Termination

Klipo began working at Impexmetal in 1987 and rose through the ranks to a senior trader until his appointment to Brassco in 1992 (Trial Tr. 434; Walarowski Dep. 52:8-23). During his four-and-a-half years at Impexmetal, Klipo became experienced in international trade transactions and, like Brassco's directors Walarowski and Pawlowski, specialized in non-ferrous products, copper, and brass products (Trial Tr. 468; Walarowski Dep. 49:14-15). Klipo's appointment to the Brassco assignment was considered a prestigious promotion (Walarowski Dep. 52:19-23; Pawlowski 65:11-14). While at Brassco, the company's directors and others at Impexmetal considered Klipo a trusted employee (Walarowski Dep. 10:3-11:4, 52:6-8; Pawlowski Dep. 65:11) and experienced businessman in dealing with international trades (Walarowski Dep. 43:19-20; Pawlowski Dep. 65:5-14).

On September 9, 1997, Impexmetal informed Klipo that his tenure as president and treasurer of Brassco would be terminated in mid-1998 and that Traczyk would succeed him (Trial Ex. 30). Walarowski discussed this decision with Klipo in March, 1998 and informed him of two reasons for his termination (Walarowski Dep. 36:13-18). First, Brassco's directors believed that the company was under-performing and, in particular, that Brassco's sales did not reflect the strong market demand for Impexmetal's products at the time (Pawlowski Dep. 87:4-15, 96:15-97:24, 107:25-108:25). In addition, the Brassco directors and others at Impexmetal had received many complaints from American customers (Walarowski Dep. 36:20-37:19). Second, Impexmetal had a standard practice of retaining employees at subsidiary companies for approximately five years (Walarowski Dep. 36:21-24; Pawlowski Dep. 65:15-21).

### D. Klipo's Dealings with Impexmetal Personnel and Brassco's Directors

During his tenure at Brassco, Klipo had regular dealings with Impexmetal personnel and Brassco's directors. For example, Traczyk testified that during Klipo's tenure as president of Brassco, Traczyk had "almost" daily contact with Klipo by telephone (Trial Tr. 49, 50). Traczyk understood Klipo to be selling Impexmetal exports, such as brass rods and other materials. Id. Klipo also had dealings with two other Impexmetal traders, Anna Raniszewska ("Raniszewska") and Ewa Trzewsowska ("Trzewsowska") (Trial Tr. 54). These traders traveled to the United States periodically to oversee operations at Brassco when Klipo took vacations and also to meet with American customers (Trial Tr. 55). Raniszewska and Trzewsowska reported to Traczyk in Poland following their visits to the United States; Klipo never informed them and they in turn never reported to Traczyk any foodstuff transactions (Trial Tr. 56). During his tenure at Brassco, Klipo also traveled to Poland and met with Traczyk. Klipo did not disclose to Traczyk, either during any of their frequent telephone conversations or during any of his visits to Poland, Klipo's intention to have Brassco deal in foodstuffs (Trial Tr. 51).

In addition to monthly statements and other reports, Brassco's directors also communicated with Klipo on a regular basis (Walarowski Dep. 13:17-18 (noting that he spoke with Klipo a couple times per month)). Klipo, however, never informed either Walarowski or Pawlowski of the foodstuffs transactions in any written or oral communication (Walarowski Dep. 24:15-16, 45:21-22, 54:14-17; Pawlowski Dep. 63:22-25, 129:24-130:5, 131:6-8).

Following Traczyk's appointment as president of Brassco, Traczyk made two trips to the United States to become acquainted with Brassco's operations and business (Trial Tr. 62). Traczyk spent four weeks at Brassco's offices from mid-February 1998 to mid-March 1998 and again approximately one week in mid-June 1998 (Trial Tr. 62-63). During these extended

visits, Traczyk spent considerable amounts of time most weekdays at Brassco's offices with

Klipo reviewing all aspects of Brassco's operations and business (Trial Tr. 62-63, 220); Klipo,

however, during these weeks never informed Traczyk about the foodstuff transactions (Trial Tr.

65, 248-49).

### E.    Brassco's Brass Ball Bearings Line of Business

In late 1996, Impexmetal and Brassco's directors decided that Brassco should

launch a new line of business involving brass ball bearings (Trial Tr. 64, 249; Trial Ex. Z;

Walarowski Dep. 22:8-25).  Andrzej Rutkowski ("Rutkowski") was appointed vice-president of

Brassco and made in charge of establishing and building up its ball bearing business (Trial Tr.

238; Walarowski Dep. 21:22-22:4).  That year, Walarowski attempted to negotiate a long-term,

$2 million annual contract with General Motors for the delivery of brass ball bearings (Trial Tr.

64; Walarowski Dep. 22:8-22, 23:22-23, 25:9-11) and Brassco made a substantial investment by,

among other measures, leasing a warehouse in an attempt to clinch a deal (Trial Tr. 64, 236,

Walarowski Dep. 32:3-33:19).  Impexmetal had an agent in the West Coast that had successfully

developed a brass ball bearing business there (Walarowski Dep. 22:15-20) and Brassco hoped to

capitalize in this market in the East Coast as well (Walarowski Dep. 22:18-22, 29:12-19).

Impexmetal and Brassco expected to incur losses at the outset of this venture but hoped in time

that the brass ball bearing line of business would become profitable (Trial Tr. 243).

Impexmetal and Brassco were unable to secure the contract with General Motors

and Brassco incurred significant losses related to this line of business (Trial Tr. 241; Pawlowski

Dep. 60:22-61:4, 107:13-18, 151:23-25).  The companies, however, deemed the losses to be

well-justified expenses connected with business development, unlike the losses incurred in

connection with the agricultural trades in which Klipo had Brassco engage (Walarowski Dep. 40:3-12, 41:3-43:6). In time, Impexmetal decided to wind down Brassco's ball bearing line of business (Trial Tr. 237) and recalled Rutkowski back to Poland in early 1998 (Trial Tr. 242; Powlowski Dep., 151:23-152:2).

As noted previously, both Klipo and Goldin, Brassco's accountant and bookkeeper, testified that Brassco reported the brass ball bearing business separately from Brassco's other metal line of business (Trial Tr. 438 (ball bearings and metals reported separately in sales journal); Pawlowski Dep. 107:21-25, 116:11-15). Klipo seemed to have been concerned with Rutkowski and the brass ball bearing business and suggested that that line of business was reported separately because Klipo did not want to be held responsible for those losses when Rutkowski was responsible for them (Trial Tr. 445).

### F. Brassco's Discovery of the Agricultural Transactions

Traczyk came to Brassco to assume his duties as the new president on July 22, 1998 (Trial Tr. 66). Two Impexmetal senior officials also came to New York to oversee the transition from Klipo to Traczyk, Brassco director Pawlowski and Bogacz, a financial manager from Impexmetal (Trial Tr. 66-67; Walarowski Dep. 35:12-13; Pawlowski Dep. 62:24-63:3). Shortly prior to his departure from Brassco and in response to some inquiries regarding travel expenses (Pawlowski Dep. 62:7-15, 63:14-18), Klipo informed Pawlowski and Bogacz about the foodstuffs transactions (Walarowski Dep. 34:5-8; Pawlowski Dep. 61:24-62:2). Pawlowski and Bogacz realized that these transactions had resulted in losses to the company (Trial Tr. 67-69). Pawlowski, in turn, informed Walarwoski by telephone about these trades (Walarowski Dep. 28:25, Pawlowski Dep. 118:14-17). Walarwoski, Pawlowski, and Traczyk all testified that,

given the narrow focus of Brassco's main lines of business they were greatly surprised and shocked by the discovery of the foodstuffs trades (Walarowski Dep. 29:4, 54:13-14; Pawlowski Dep. 94:18-96:2, 118:24).

Traczyk conducted an investigation of these transactions beginning on August 3, 1998 (Trial Tr. 72-73). Traczyk discovered binders, which contained documents related to the agricultural transactions (Trial Tr. 75-76). These binders were stored separately from all of Brassco's other records; Traczyk found them in Klipo's office where they were kept in plain view (Trial Tr. 256). These binders contained purchase and sales invoices and bills of lading (Trial Tr. 79).

### G.  The Unauthorized Agricultural Transactions

#### 1.  The Foodstuffs Transactions

Traczyk's investigation uncovered numerous unauthorized foodstuffs transactions (Trial Tr. 72–73, 74, 79).[2] These transactions involved the purchases of foodstuffs from five suppliers[3] and the sale of these products to two companies, Marius FT and Alama; some of the transactions between Marius FT and Brassco occurred through an intermediary company called Intertec Trading (Trial Tr. 79). These transactions began in late 1995, continued throughout 1996 and 1997 up until July, 1998 (Trial Tr. 407, Ex. 43, at 00000013, 0000000019, 00000096, and 00000127).

---

[2] In all, Brassco's forensic accounting expert uncovered 31 agricultural transactions: 1 in 1995 (Ex. 43, at 00000013); 18 in 1996 (Ex. 43, at 00000019), 7 in 1997 (Ex. 43, at 00000096), and 5 in 1998 (Ex. 43, at 00000127).

[3] The five suppliers of foodstuffs involved in the agricultural transactions were Finora, Fudem Trading, Agri Sales, Red River, and Sinimpex (Trial Ex. 46).

In examining the single transaction involving foodstuffs that Klipo engaged in in 1995, Klipo prepaid a portion of the purchase price and the balance within one week (Trial Ex. 43, at 00000013). Klipo resold the red kidney beans on November 21, 1995 and was paid 40 days later on December 31, 1995. Id. While the resale transaction did not involve any secured method of payment, the open account was settled quickly (Trial Ex. 43, at 00000019). In 1996, on the acquisition side for food stuff transactions, there seems to be a pattern of partial prepayments and the settling of open accounts within a short period of time. Id. The resales to Intertec and Marius FT, however, reflect payment periods of anywhere from four to eight months. Id. This means that Brassco's capital was tied up because it has been extended in the form of a loan to the buyer of the food commodity products. For the eighteen transactions entered into in 1996, payments were made in 1996 and in 1997, and all payments were made no later than October, 1997. Id.

The transactions in 1997, which were exclusively with Marius FT totaling some $295,000, reflected prompt payment on the acquisition side and slow payment by the buyer, Marius FT (Trial Ex. 43, at 00000096). Starting in October of 1997, Klipo engaged in a series of transactions with Marius FT involving some $256,000 cost of product, the majority of which Marius FT never paid. Id. As early as January 6, 1998 Marius FT had an outstanding balance of $251,585 (Tr. Ex. 19).

Traczyk found that Brassco did not derive a benefit from these transactions (Trial Tr. 86). The structure of the foodstuffs transactions, in which Brassco either prepaid the suppliers or issued letters of credit in favor of the suppliers and did not take any steps to secure

payment from the ultimate buyers in Poland (Trial Tr. 112), contrasted starkly with Brassco's

and Impexmetal's customary business practices (Trial Tr. 35-42; Walarowski Dep. 29:4-25).

Traczyk also discovered correspondence related to the transactions in which

Klipo requested outstanding payments from Mariusz Chrzan ("Chrzan") for foodstuff deliveries

owed by Marius FT (Trial Tr. 108, Exs. 18-22).  As noted earlier, Chrzan appeared to be the sole

proprietor and principal of Marius FT (Tr. at 101, 107, 397).  The earliest correspondence

occurred on December 15, 1997, approximately three months following Klipo's notification of

his termination (Trial Tr. 108-09, Trial Ex. 18).  The correspondence also showed that the

payments outstanding from Marius FT to Brassco grew from an amount of $251,585 on January

6, 1998 (Trial Ex. 19) to $312,644 on April 4, 1998 (Trial Ex. 21).  Thus, notwithstanding being

owed significant sums, Klipo continued to deal with Marius FT and never sought security for

Marius FT's payments due to Brassco.

Traczyk also uncovered a document, which appeared to be a fax from Klipo to

Chrzan, which contained information related to Klipo's personal bank account in Poland (Trial

Ex. 17; Trial Tr. 105).[4]  Notwithstanding the mounting debts from Marius FT and Intertec

Trading, Brassco continued to engage in trades with the company and shipments occurred as late

as July, 1998 (Trial Tr. 111).

---

[4] During the trial, Klipo admitted that he had written the information related to the personal bank account
but denied having written any of the other information on the document.  The other handwritten information on the
document included the following:  next to "attention" on the facsimile form appeared the name of "Marius Chrzan;"
next to "from" on the form appeared the name of "Andrej;" and some handwritten numbers appeared on the form
next to the handwritten information to which Klipo did admit writing.  The document was printed on outdated
company letterhead (Trial Tr. 393).  Prior to trial and Klipo's testimony, the parties had stipulated to the admission
of this document (Trial Tr. 120).

The Court notes that Klipo admitted some of the handwriting was his, but said that he could not be sure if
all of the handwriting was his.  Klipo offered no credible explanation as to who else would write the information or
why it would be written.  Also, Klipo never denied that he received money from Chrzan into his personal bank
account but merely put forth unconvincing explanations for these deposits.

Ultimately, one foodstuffs purchaser, Alama, paid all the invoices issued by Brassco (Trial Tr. 123). The Alama trades all occurred in 1996 and involved only two transactions (Trial Ex. 43, at 00000019). Brassco, however, incurred losses from outstanding payments from Marius FT and Intertec Trading, which as of July 31, 1998 (*i.e.,* the end of Klipo's tenure as president of the company) totaled $271,265.28 (Trial Tr. 523; Trial Ex. 43, at 00000011).

Given Klipo's broad experience as an international trader at both Impexmetal and Brassco, the unsecured financing of the foodstuffs trades with unknown and relatively small companies struck the Brassco directors as imprudent and entirely unbusiness-like (Walarowski Dep. 29:9-10, 29:19-25, 31:19-23, 44:15-19; Pawlowski Dep. 94:20-25). Moreover, the reckless nature of these transactions, and their continuation in the face of mounting outstanding debt, cannot be explained, but for the deposits Chrzan was making into Klipo's account. Klipo's explanation that Chrzan was repaying him in installments for personal items Klipo had purchased in the United States is incredible. Klipo could not recall whether the personal items were cameras, or computers, or how specific items were delivered (Trial Tr. 447 (Klipo stating that he received payment from Chrzan "for some stuff [he had] bought for him," that he "didn't remember exactly," and that the "stuff" was "some electronics, cameras, video")). His explanation at trial were at variance from the contemporaneous explanations on the wire transfer documents of "return of down payment" (Trial Ex. 42, at 00000016) and "payment for construction services" (Trial Tr. 560). See, infra, Pt. III(H) (discussing trial evidence regarding payments by Chrzan to Klipo).

## 2.     Financial Effect of Foodstuffs Transactions on Brassco

As early as July, 1997, Brassco began to experience liquidity problems and had trouble paying Impexmetal invoices (Trial Tr. 409).  On July 21, 1997 Klipo sent a facsimile to Impexmetal's Finance Director requesting that payment schedules be suspended in order to secure lines of credit and also for assistance from Impexmetal in obtaining such lines of credit (Trial Ex. 12).  This communication made no mention of any foodstuffs transactions. Id.  On March 18, 1998, Klipo sent another facsimile addressed to two Impexmetal officials, including Brassco board director Pawlowski (Trial Ex. 11).  In this communication, Klipo addressed Brassco's high level of indebtedness, in part attributing it to an estimated $150,000 in losses from the failed brass ball bearing venture. Id.  Klipo, again, made no mention of the agricultural trades, which at that time accounted for over $282,454 in outstanding payments to Brassco (Exs. 11 & 21; Trial Tr. 412).  Klipo also discussed the liquidity problem with Brassco director Pawlowski in telephone conversations (Pawlowski Dep. 99:2-10).

In addition, Klipo caused Brassco to enter into a contract for $150,000 with Marius FT for the shipment of red kidney beans on a monthly basis from January, 1998 through July, 1998 (Trial Tr. 419), even though during this period Marius FT already owed Brassco over $250,000 in outstanding payments (Exs. 18, 19).  As noted previously, Brassco's prepayment of foodstuffs to the sellers and long delays in payment by the buyers contributed to its liquidity problems (Trial Tr. 431).

In June, 1998, Brassco director Walarowski wrote to Brassco's accountant noting "great concerns" regarding the company's growing net operating losses (Trial Ex. 40).  Brassco's forensic accounting expert testified that in 1997, the foodstuffs transactions accounted

for 4.23% of total sales, but 67.27% of working capital. In 1998, foodstuffs transactions represented 6.67% of total sales, but 65.8% of working capital. That is, these unauthorized trades represented the bulk of the losses in these years (Trial Tr. 536-38). The majority of the debt attributable to the foodstuffs transactions accrued toward the end of 1997 and throughout the 1998 period (Trial Tr. 539). By August, 1998, these outstanding invoices comprised a disproportionate amount of accounts receivable (*i.e.,* almost one-third) when compared to those of metals transactions (Trial Tr. 133). Moreover, the foodstuffs transactions by reducing Brassco's liquidity and using up its available capital, impeded the company's ability to engage in the established lines of business (*i.e.*, trading in metals) (Trial Tr. 110; Pawlowski Dep. 113:14-17).

The case of Klipo entailed the only instance at Impexmetal and its international sales network in which a trader abroad engaged in unauthorized transactions outside of established main lines of business (Trial Tr. 285).

### H.    Payments By Chrzan into Klipo's Personal Bank Account

Starting in October, 1997, Chrzan made a series of electronic transfers into Klipo's personal bank account in Poland (Trial Ex. 42). These deposits occurred beginning on October 1, 1997, for an amount of 5,000 zloty (Trial Ex. 42, at 00000017), on December 8, 1997 for an amount of 5,000 zloty (Trial Ex. 42, at 00000011), on December 19, 1997 for an amount of 9,800 zloty (Trial Ex. 42, at 00000014), on December 23, 1997, for an amount of 4,500 zloty (Trial Ex. 42, at 00000014), on April 9, 1998 for an amount of 5,000 zloty (Trial Ex. 42, at 00000008), and on June 30, 1998 for an amount of 10,000 zloty (Trial Ex. 42, at 00000005). Bank records, thus, showed a total of 39,300 zloty wired by Chrzan to Klipo over a nine-month

period, starting on October 1, 1997 (soon after Klipo learned of his termination) and ending on June 30, 1998 (the final month of his tenure at Brassco). At the time of these transfers, 39,300 zloty had a value equal to $11,293.10 U.S. (Trial Tr. 561). Notably, the bank record for the October 1, 1997 wire transfer had a notation under a box titled "explanation" of "return of down payment" (Trial Ex. 42, at 00000016). In addition, the bank record for the December 19, 1997 wire transfer also had a notation of "payment for construction services" (Trial Tr. 560).

* * * * * *

This case turns almost entirely on the credibility of witnesses and, most particularly, on the credibility of defendant Klipo. The Court heard testimony from Traczyk, Goldin, Klipo, Mrs. Klipo, and McNulty, Brassco's forensic accounting expert. Overall, the Court found the testimony of Mrs. Klipo generally but not entirely credible. Others testified, as she did, however, that she was not involved in any of the transactions at suit. Klipo's testimony was at substantial variance from the testimony of others and from the documents. His testimony was inconsistent and evasive. In short, it was not credible.

**Klipo's Non-Disclosure of the Foodstuffs Transactions.** As noted previously, Klipo had regular dealings with Impexmetal personnel (such as Traczyk), Brassco's directors, and Brassco's bookkeeper and accountant. These individuals, however, all testified that Klipo never disclosed his intention for Brassco to trade in foodstuffs. Klipo also submitted regular reports, such as monthly, quarterly, and annual financial statements to Brassco's directors (Pawlowski Dep. 76:18-77:10) and met with the directors regularly at annual shareholder and board director meetings (Pawlowski Dep. 59:7-16). Klipo did not disclose the agricultural transactions in any annual report from 1994 through 1996 (Trial Ex. 7, at 00000011 (financial

statement for 1994 and assumptions for 1995); Trial Ex. 8, at 00000010-12 (financial statement for 1995 and assumptions for 1996); Trial Ex. 9, at 00000009-10 (financial statement for 1996 and assumptions for 1997)).   Moreover, minutes from shareholder meetings do not reveal any discussion about any foodstuffs (Trial Ex. 13 (shareholder meeting minutes of April 10, 1996); Trial Ex. 14 (shareholder meeting minutes of June 9, 1997); Trial Ex. 15 (shareholder meeting minutes of April 6, 1998)).

Traczyk, Walarowski, and Pawlowski all testified – either at trial or by deposition – at being shocked by these transactions.  Walarowski, in particular, stated that the financing structure and entire undertaking of the agricultural transactions were extraordinary not only with regard to Impexmetal's and Brassco's longtime focus on metal products but also in light of Klipo's broad experience and expertise in international metals transactions.   Because of their unsecured financing, Klipo's lack of expertise in the agricultural markets, and the unknown and small nature of the companies with which he dealt, Walarowski characterized Klipo's trades as "business negligence" (Walarowski Dep. 44:15-19).

With regard to the issue of non-disclosure of the agricultural sales, Klipo provided several explanations.  First, Klipo claimed that he decided to have Brassco trade in foodstuffs in late 1995 or early 1996 (Trial Tr. 380) and that he did so because Brassco director Masiuk urged Klipo to explore other lines of business (Trial Tr. 381).  Klipo believed that he was under no obligation to disclose the decision at that time (Trial Tr. 381).  Second, Klipo further explained that American banks had rejected Brassco's applications for credit lines for lack of credit references from American companies.  Klipo maintained that he had mentioned this problem to Walarowski, and that they discussed purchasing products in the United States in

order to establish credit references (Trial Tr. 381).[5]   The explanation seems far-fetched in as much as the foodstuffs transactions started in earnest in 1996, long after Brassco was established. Furthermore, generally, with regard to the agricultural trades, these transactions were secured on the purchase end – not on the sales end.  Klipo did not take any steps to protect against defaulted payments.  This factor is surely as important as making payments to suppliers.

Third, Klipo also testified that he was instructed by board directors Walarowski and Masiuk at the annual meeting not to mention agricultural foodstuffs because they were only interested in the main lines of business and that the agricultural sales comprised a small percentage of total sales (Trial Tr. 374-75, 377, 380).  Klipo further testified that he had discussed his intention for Brassco to trade in foodstuffs with both Masiuk and Walarowski (Trial Tr. 382; see also Trial Tr. 473 (Klipo testifying that he discussed the foodstuff transactions with Goldin, Traczyk, and the Impexmetal traders who covered the office while Klipo took vacation)).  They all denied it.

Klipo's testimony regarding his purported disclosure of the agricultural transactions is not credible.  First, much of Klipo's testimony in this regard is inconsistent. Second, Klipo's explanation that Brassco needed American customers in order to secure lines of credit is unconvincing.  Impexmetal had a successful agent in the West Coast and traded internationally; Impexmetal could have easily assisted Brassco in securing such credit.  By 1996, Brassco had been operating in the United States for almost two years and it is unlikely that it needed to establish credit lines and even more unlikely that the way for the company to do so

_____

[5]   At a later point in his examination, Klipo testified that he could recall a couple of discussions with Walarowski and Pawlowski about foodstuffs transactions but could not recall when he had first had these discussions other than they occurred between 1996 and 1998 (Trial Tr. 442-43).  They, of course, had denied any prior knowledge of the foodstuff transactions.

required it to trade in foodstuffs. In any event, Klipo offered no documentary evidence of his attempts to secure United States credit. As noted previously, the foodstuffs transactions entailed prompt payment on the supply end and no steps whatsoever to protect Brassco on the sales end. The structure of these trades is particularly significant because Klipo offered absolutely no evidence of the credit-worthiness of the purchasers of the foodstuffs.

Third, with regard to Klipo's contention that Masiuk encouraged the foodstuffs trades, the Court notes that at a pretrial conference held on September 13, 2005, Klipo's counsel asked for a continuance in order to depose Masiuk. The Court granted Klipo a 60-day continuance in order to depose Masiuk either in Poland or the United States. It is particularly significant that the person Klipo claimed could exculpate him, Masiuk, did not testify at trial – and Klipo did not depose him. Finally and notably, notwithstanding Klipo's testimony on the stand, at a deposition given in 2002, Klipo had testified that he did not remember discussing or informing anyone at Impexmetal or any of the Brassco board directors about agricultural trades (Trial Tr. 383).

**Klipo's Testimony Regarding the Red River Commodities Contract and the Other Foodstuffs Trades.** As noted previously, Klipo caused Brassco to enter into a $150,000 contract for the monthly delivery of red kidney beans to Marius FT from January, 1998 to July, 1998. Klipo executed this contract even though Marius FT owed significant amounts to Brassco – *i.e.,* over $251,000 in January, 1998 (Exs. 19, 20). Klipo testified that he tried to cancel the contract and to find other buyers, but was unable to do so (Trial Tr. 430). Again, Klipo offered no documentary evidence to support this statement.

Klipo gave conflicting testimony concerning whether he disclosed this problem to the Brassco board directors. Initially, Klipo admitted that he did not inform Brassco board director Pawlowski about the mounting accounts receivables and that he certainly did not do so in his March 18, 1998 communication to Impexmetal (Trial Tr. 431; Trial Ex. 11). At a later point in the examination, referring to the April 6, 1998 annual meeting, Klipo testified as follows: "I think we [*i.e.,* referring to himself, Pawlowski, and Walarowski] discussed it during [the] shareholder meeting – I don't recall exactly. I think we discussed it" (Trial Tr. 433). Still later in response to a question whether Klipo had memorialized anything in writing regarding the growing foodstuffs-related debts during April, 1998, Klipo stated "I don't recall but definitely we spoke [about it]" (Trial Tr. 434).

Klipo also provided conflicting testimony regarding the financing of the agricultural and other Brassco transactions. Contrary to the testimony of Traczyk, Walarowski, and Pawlowski, Klipo testified that Brassco engaged in "open account," unsecured transactions with American customers whereby Brassco prepaid for Impexmetal products without securing letters of credit or bank guarantees from the ultimate buyers (Trial Tr. 454-55). Klipo also testified, however, that during his tenure as president of Brassco, the company only prepaid a "few" times (Trial Tr. 493).

Klipo's testimony regarding the Red River Commodities trades is not credible. Given Klipo's broad experience and training in international transactions, executing a $150,000 unsecured contract with monthly deliveries with a buyer that owed the company over $250,000 at the outset of the deliveries and over $300,000 during the mid-point of the term of the contract

crossed the line from imprudent to willful malfeasance — especially in light of the payments by Marius FT into Klipo's personal bank account.

**Klipo's Testimony Regarding Chrzan's Payments Into His Personal Bank Account.** Klipo testified that he had known Chrzan from when he was a university student (Trial Tr. at 461) and that, although Klipo trusted Chrzan, Klipo had checked Chrzan's trading references (Trial Tr. at 462). When Mrs. Klipo testified with regard to Marius FT and Chrzan, she appeared nervous at the mention of his name. Mrs. Klipo provided additional testimony that Klipo and Chrzan knew each other, had been students together, and were in the same social circle (Trial Tr. 504). Mrs. Klipo, however, hesitated to characterize Klipo and Chrzan as "friends" (Trial Tr. 504) and suggested that she barely knew him having seen him only once or twice (Trial Tr. 503-04). The Klipos' inconsistent testimony regarding Chrzan lends further support that Klipo and Chrzan had more than a business relationship and that the payments were strictly kickbacks.

Regarding the disputed fax cover sheet, which indicated that it was being sent from Klipo to Chrzan and which contained information regarding Klipo's personal bank account in Poland, Klipo testified that he did not recall sending the fax to Chrzan (Trial Tr. 394). By way of explanation for the deposits into his personal account, Klipo testified that he made personal purchases for Chrzan, such as cameras, photo equipment, and "other stuff," and that Chrzan repaid him for them (Trial Tr. 395). Klipo could not recall how many electronic items he had purchased for Chrzan (Trial Tr. 447) or the particular amount of any particular item purchased (Trial Tr. 448). Klipo testified that he either transported the items to Poland during one of his frequent trips or gave the items to others to deliver to Chrzan and that he did not retain either

shipping documents or receipts (Trial Tr. 448).  Klipo further testified that Chrzan made deposits of amounts in round numbers because he repaid Klipo in installments.  Id.

The Court found Klipo's testimony regarding these deposits not credible.  First, Klipo could not specify exactly what items he had purchased or how much he had paid for them; and, he kept no receipts or record to demonstrate that these purchases were made for the items he claimed.  Second, Klipo's explanation that Chrzan paid him in installments to explain the amounts in round numbers is belied by the rest of the evidence – particularly the notations, which appear on the wire transfers and which indicate that the deposits were made for the "return of down payment" and for "payment for construction services" (Trial Tr. 560).  These contemporaneous statements of course are at considerable variance from Klipo's trial explanation.

In sum, Klipo gave either conflicting testimony or not credible testimony regarding key factual issues, including whether he had disclosed his intent for Brassco to trade in foodstuffs to Impexmetal officials and Brassco board directors and whether he disclosed that outstanding payments from the agricultural transactions contributed to Brassco's liquidity problems.  Klipo also gave either conflicting testimony or not credible testimony regarding the rationale for entering into the agricultural trades in the first place, for continuing to do business with Marius FT, and for the deposits of funds by Chrzan into his personal bank account.  In fact, Klipo did not offer a rational explanation for these payments and the Court rejects the explanation Klipo gave as not credible.  Having considered all the testimony in the record and heard the live testimony of all the witnesses during the trial, the Court finds Klipo's testimony regarding all of these key factual issues not credible.

Notably, the timing of Chrzan's contributions to Klipo's personal bank account occurred late in 1997 and early 1998. This is just about the time that Klipo engaged in a number of trades with Marius FT. In particular, from October of 1997 through July 1998, Klipo bought and resold approximately $268,000 worth of red kidney beans to Marius FT for which Brassco was not paid. Further, Klipo entered into these transactions when Marius FT owed more than $100,000 to Brassco. These transactions were so reckless that they were in breach of his obligations under the by-laws and his employment contract. Given his long-time experience in foreign trading, these trades so departed from customary norms they also constitute a breach of loyalty. There is only one explanation for this behavior and that is the payment of funds by Marius FT to Mr. Klipo's bank account in Poland.[6]

The Court, thus, finds that Klipo did not disclose the agricultural trades, that these transactions were unauthorized, that the Red River Commodities deliveries, which began in January, 1998 and ended in June, 1998, constituted willful malfeasance to the company, and that the payments into Klipo's accounts were kickbacks from Chrzan for economically unreasonable and unjustifiable financing terms.

### III. Mrs. Klipo Provided Clerical Services Only and Did Not Engage in Trades

The witness and deposition testimony showed that Mrs. Klipo's role at Brassco was to provide clerical and secretarial services (Trial Tr. 295, 497-503, 507-08, 510). Brassco's directors testified that Mrs. Klipo did not participate in meetings or engage in trading or other substantive work. (Walarowski Dep. 38:2-9-39:9; Pawlowski Dep. 103:20-104:9, 139:2-6,

---

[6] There may have been more such payments, but Brassco submitted into evidence only those documents they were able to obtain from Klipo's bank (Trial Tr. 544, 562). Apparently, under Polish law, banks' obligation to maintain records is time-limited such that Brassco was unable to obtain records prior to October, 1997.

155:22-157:5).  The Court finds that Mrs. Klipo did not engage in the unauthorized transactions in any manner other than through the provision of clerical services under the supervision and direction of Klipo.

**CONCLUSIONS OF LAW**

The Court's subject matter jurisdiction is based on diversity and the Court applies New York law. 28 U.S.C. § 1332.

**I.      Fraud**

**A.      Liability**

Under New York law, "[i]n an action to recover damages for fraud, the plaintiff must prove a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury."  Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421 (1996) (citation omitted); see also Vermeer Owners, Inc. v, Guterman, 78 N.Y.2d 1114, 1116 (1991) (setting out elements of fraud as "a representation of material fact, falsity, scienter, reliance and injury").  The plaintiff must demonstrate each of the fraud elements "by clear and convincing evidence."  Vermeer Owners, Inc. v, Guterman, 78 N.Y.2d at 1116.  Moreover, the "elements of fraud are narrowly defined." Gaidon v. Guardian Life Insur. Co., 94 N.Y.2d 330, 331 (1999).

The Court finds that Brassco proved that Klipo engaged in fraud by clear and convincing evidence.  Klipo's failure to disclose the foodstuffs transactions constituted a material omission of fact, which rendered the financial statements he submitted to the board directors false and known to him to be false.  Klipo did not disclose these transactions in order to

induce Brassco's reliance; the kickbacks and details surrounding them (*i.e.,* their timing and the incriminating comments on the wire transfers) constitute evidence of scienter. As Klipo was a trusted employee, Brassco justifiably relied on Klipo's reports and communications to board directors. Finally, Brassco was injured in the amount of the outstanding Marius FT debt (*i.e.,* $271, 265.28).

##### B. Damages

"[T]he proper measure of damages in a fraud action is the actual pecuniary loss sustained as a direct result of the wrong," <u>Masiano v. Beckoff</u>, 2 A.D.3d 412, 413 (2d Dep't 2003) (citing <u>Lama Holding Co. v. Smith Barney Inc.</u>, 88 N.Y.2d at 421), which in this case equals $271,265.28. Klipo argues that any damages found by the Court should be reduced by the $105,000 judgment Brassco obtained in Poland against Chrzan, even though Brassco has been unable to collect on that judgment. Klipo, however, is not entitled to an offset.

The Court did not find any case law directly on point – *i.e.,* involving the liability of one tortfeasor in light of an uncollected judgment against another tortfeasor. The Restatement of Torts states as follows:

> A payment made by a tortfeasor or by a person acting for him to a person whom he has injured is credited against his tort liability, as are payments made by another who is, or believes he is, subject to the same tort liability.

Restatement (Second) of Torts § 920A(1) (1979); <u>see</u> <u>also</u> <u>id.</u> § 920A cmt. a ("If a tort defendant makes a payment toward his tort liability it of course has the effect of reducing that liability . . . [;] [t]his is also true of a payment by another tortfeasor of an amount for which he is liable jointly with the defendant. . . ."). Although Klipo stipulated to the judgment amount against

Chrzan, he did not offer any evidence that Chrzan paid any part of the judgment to justify a set-off.

Even if Chrzan had made a payment, under the doctrine of collateral sources, Brassco may be entitled to a judgment against Klipo for the full amount of its pecuniary loss. This doctrine holds that "[p]ayments made to or benefits conferred on an injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable." Restatement (Second) of Torts § 920A(2). Thus, under this rule, "it is the tortfeasor's responsibility to compensate for all harm that he causes, not confined to the net loss that the injured party receives." § 920A cmt. b. While the collateral source rule has been curtailed by statute in many areas, § 920A cmt. d,[7] the doctrine continues to be applied in a number of instances, including for instance for recoveries under insurance policies, employment benefits, and gratuities. § 920A cmt. c. Except in those circumstances where the rule is superceded by statute, New York courts recognize the collateral-source doctrine. See, e.g., Kish v. Board of Educ., 76 N.Y.2d 379, 384-86 (1990) (personal injury; discussing application of doctrine); Healy v. Rennert, 9 N.Y.2d 202, 206-07 (1961) (same).

Thus, given the fact that Klipo did not show any satisfaction of the judgment against Chrzan, he is not entitled to an offset by that judgment amount. Moreover, even if Brassco had collected on that judgment, Klipo would likely have been liable for the entire amount of damages under the doctrine of collateral sources.[8]

---

[7] For example, in New York, a series of statutory changes have limited the rule's effect in order to prevent multiple recoveries by plaintiffs of the same injury. Oden v. Chemung Co. Indus. Dev. Agency, 87 N.Y.2d 81, 87-88 (1995).

[8] It should be noted that, with regard to claims for breach of contract, "the collateral source rule does not apply because 'no one should profit more from the breach of an obligation than from its full performance'." Garofalo v. Empire Blue Cross and Blue Shield, 67 F. Supp.2d 343, 347 (S.D.N.Y. 1999) (citations omitted). This, however, does not mean that Klipo is automatically entitled to a setoff in the amount of the Polish judgment against Chrzan. Rather, Klipo would be entitled to institute a contribution claim based on unjust enrichment against Chrzan.

## II.  Breach of Employment Contract and Duty of Loyalty

During the relevant period, Klipo served as both president and treasurer of

Brassco.  Klipo's employment contract did not contain an express prohibition against engaging

in trades other than in Brassco's main lines of business (*e.g.,* non-ferrous metals, steel, and ball

bearings) and no other written document prescribed Brassco's main lines of business.  Klipo's

employment contract, however, contained the following generalized language:

> The Employee agrees to work for Brassco full time with the
> applicable duties and obligations as set forth in the By-Laws as
> well as such other duties as are consistent therewith as may be
> designated by the shareholder and the Employee further agrees to
> use his best efforts to promote the business and interests of the
> Employer.

Trial Exs. D, ¶ 3 & E, ¶ 3.  The by-laws further stated that as president of Brassco Klipo was

"entrusted . . . with the management of the business and affairs of the Corporation and sh[ould]

see that all orders and resolutions of the shareholders are carried into effect." Trial Ex. B, Art.

IV, § 3.  As treasurer, Klipo was to "keep full and accurate accounts of receipts and

disbursements in the corporate books," Id., Art. IV, § 6(b), and "render a full financial report at

the annual meeting of the shareholders if so requested." Id., Art. IV, § 6(f).

Under New York law, "[t]he duties of an employee are determined . . . in view of

the nature of contract of employment, the provisions of the agreement between employer and

employee, and *the attending circumstances which disclose the intention of the parties*." 52 N.Y.

Jur. § 182 (emphasis added).  Where an employee breaches an employment contract, plaintiff

employer's damages equal the profit loss attributable to that defendant employee's breach while

---

Dan B. Dobbs, Law of Remedies:  Damages, Equity, Restitution § 4.3(4), 408 (2d ed. 1993).

in the plaintiff's employ. <u>Independent Metal Strap Co. v. Cohen</u>, 96 A.D.2d 830, 831 (2d Dep't 1983) (non-competition clause breached). The evidence at trial overwhelmingly showed that everyone involved – both at Brassco and at Impexmetal – intended Brassco to trade in its narrowly defined and maintained lines of business and that the agricultural trades were unauthorized and extraordinary.

      Because the agricultural trades were outside established lines of business and, especially, because they departed from customary norms to an extreme degree, Klipo cannot avoid liability based on the defense of the business judgment rule. This defense applies only to "actions of corporate directors 'taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes'." <u>Levandusky v. One Fifth Ave. Apartment Corp.</u>, 75 N.Y.2d 530, 537 (1990) (citation omitted). The evidence at trial – particularly in light of the Chrzan payments into Klipo's personal bank account and the reckless nature of the transactions themselves – overwhelmingly showed that Klipo acted neither in good faith nor in the exercise of honest judgment.

      **Duty of Good Faith and Loyalty.** "[A]n employee is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." 52 N.Y. Jur. § 183; <u>see</u> <u>e.g.</u>, <u>Duane Jones Co. v. Burke</u>, 306 N.Y. 172, 187-88 (1954) (same as to officers and directors). In <u>Feiger v. Iral Jewelry, Limited</u>, the New York Court of Appeals described the damages plaintiff-employers are entitled to in cases involving an employee's breach of the duty of loyalty as follows:

> One who owes a duty of fidelity to a principal and who is faithless
> in the performance of his services is generally disentitled to

recover his compensation, whether commissions or salary. Nor
does it make any difference that the services were beneficial to the
principal, or that the principal suffered no provable damage as a
result of the breach of fidelity by the agent.

Feiger v. Iral Jewelry, Ltd., 41 N.Y.2d 928, 928-29 (1977) (citations omitted). Thus, employee

disloyalty can entitle the plaintiff employer to disgorgement of "all salary, commissions, and

expenses the employer paid to plaintiff during the period of disloyalty." Henderson v. Rep Tech,

Inc., 162 A.D.2d 1028, 1028 (4th Dep't 1990); see also id. ("The compensation paid an employee

during the period of disloyalty is a component of the profit for which an employee must account

and is subject to forfeiture.").

Thus, Brassco is entitled to disgorgement of Klipo's salary during the period of

time in which Klipo received payments from Chrzan and the Red River Commodities deliveries

were occurring, October, 1997 through July, 1998, as well the total amount he received in

kickbacks (Trial Ex. 42). Klipo's annual salary in 1997 and 1998 was $70,000 (see, supra,

stipulated fact). In 1997, Brassco paid Klipo for October, November, and December, 1997 a

total of $17,500 (i.e., three times the monthly salary of $5,833.33). In 1998, Brassco paid Klipo

for seven months (i.e., January, 1998 through July, 1998) a total of $40,833.33 (i.e., seven times

$5,833.33). Klipo, thus, received total salary payments from Brassco from October, 1997

through July, 1998 of $58,333.33 and, as well, a total of $11,293.10 in kickbacks from Chrzan –

both amounts of which Klipo must repay to Brassco.

III.     Prima Facie Tort

"The requisite elements of a cause of action for prima facie tort are (1) the

intentional infliction of harm, (2) which results in special damages, (3) without any excuse or

justification, (4) by an act or series of acts which would otherwise be lawful." Freihofer v. Hearst

Corp., 65 N.Y.2d 135, 143 (1985) (citations omitted). "[F]or an action in prima facie tort to succeed, . . . a plaintiff must demonstrate that the defendant inflicted harm 'for the sake of the harm as an end in itself, and not merely as a means to some further end legitimately desired'." Fabry v. Meridian Vat Reclaim, Inc., 99 Civ. 5149, 2000 U.S. Dist. LEXIS 15092, *6 (Oct. 11, 2000) (citation omitted). "New York courts have emphasized repeatedly that malice is an essential element of prima facie tort and that a claim of prima facie tort does not lie where the defendant has any motive other than a desire to injure the plaintiff." Durham Indus. v. North River Insur. Co., 673 F.2d at 40 (collecting cases). Motives that defeat a claim of prima facie tort include "profit, self-interest, [and] business advantage" Id. (citation omitted). Here, the Chrzan payments constitute evidence of self-interest. Thus, Klipo is not liable on the basis of prima facie tort.

IV.     **Conversion**

"Conversion is the 'unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights'." Vigilant Insur. Co. v. Housing Auth., 87 N.Y.2d 36, 44 (1995) (citation omitted). Actions for the conversion of money are cognizable only in cases "where there is an obligation to return or otherwise treat in a particular manner the specific money in question." 23 N.Y. Jur. § 9 (citing as examples coins). Thus, "[m]oney must be specifically identifiable and segregated" in order to be the subject of an action in conversion; if "the allegedly converted money is incapable of being described or identified in the same manner as specific chattel, it is not the proper subject of a conversion action." Fiorenti v. Central Emergency Physicians, P.L.L.C., 187 Misc. 2d 805, 809-10 (Nassau Co. Sup. Ct. 2001) (citations and internal quotation marks omitted). Because the

funds at issue in this case – *i.e.,* the prepayments Brassco made to Marius FT – cannot be

distinguished as specific chattel, Brassco does not have a cause of action for conversion.

## V.       Prejudgment Interest

In a diversity suit, state law determines the availability of prejudgment interest.

Trademark Research Corp. v. Maxwell Online, Inc., 995 F.2d 326, 342 (2d Cir. 1993).  "In an

action at law, prejudgment interest is recoverable as of right." Id. (citing Hilord Chem. Corp. v.

Ricoh Elec., Inc., 875 F.2d 32, 39 (2d Cir. 1989)).  Section 5001 of the New York Civil Practice

Law and Rules governs prejudgment interest.  This provisions states as follows:  "[i]nterest shall

be recovered upon a sum awarded because of a breach of performance of a contract." N.Y.

C.P.L.R. § 5001(a) (McKinneys 2006).  Under New York law, prejudgment interest can also be

obtained for common law fraud claims. Mallis v. Bankers Trust Co., 717 F.2d 683, 694 (2d Cir.

1983) (citation omitted).

"Interest shall be computed from the earliest ascertainable date the cause of action

existed," and "[w]here such damages were incurred at various times, interest shall be computed

upon each item from the date it was incurred." N.Y. C.P.L.R. § 5001(b).  "Under New York law,

courts must apply the statutory rate of interest," Action S.A. v. Marc Rich & Co., 951 F.2d 504,

508 (2d Cir. 1991), which is nine percent. N.Y. C.P.L.R. § 5004 ("Interest shall be at the rate of

nine per centum per annum, except where otherwise provided by statute.").

Brassco is thus entitled to statutory prejudgment interest of nine percent as

follows:  (a) with regard to the $271,265.28 in total debt from Marius FT, as of the dates and

amounts set out in Schedule A appended to this Court's Opinion and Order; and (b) as of

October 1, 1997, the date of the first wire transfer from Chrzan to Klipo, for both the $11,293.10 Klipo received in kickbacks and $58,333.33 in disgorgement of salary.

## VI.    **Punitive Damages**, **Attorneys' Fees, and Costs**

"Under New York law, punitive damages are appropriate in cases involving 'gross, wanton, or willful fraud or other morally culpable conduct'." Action S.A., 951 F.2d at 509 (citing Borkowski v. Borkowski, 39 N.Y.2d 982, 983 (1996)).  The award of punitive damages is within the discretion of the trier of fact and appellate courts pay deference to trial courts' "findings forming the basis of its conclusion whether a defendant's conduct was gross, wanton or morally culpable." Whitney v. Citibank, 782 F.2d 1106, 1119 (2d Cir. 1986) (citation omitted).  The trial court judge is "in the best position to determine whether or not the award of punitive damages [i]s an appropriate remedy." Action S.A., 951 F.2d at 509.

This Court heard live testimony from the Klipos and three Brassco representatives, Traczyk, Goldin, and McNulty.  While the Court found that Klipo is liable to Brassco, in light of all of the evidence before it, it does not believe that punitive damages are appropriate – whether to offset attorneys' fees and costs, Softel, Inc. v. Dragon Med. and Sci. Commc'ns Ltd., 891 F. Supp. 935, 945 (S.D.N.Y. 1995) (citing New York case law), or as form of deterrence, Whitney, 782 F.2d at 1118.  While Klipo's conduct was wilful and in bad faith, the Court believes that the considerable total compensatory damages awarded in this judgment will serve as an appropriate punishment. Softel, Inc., 891 F. Supp. at 945.  The Court has also taken into account the fact that Brassco's directors and Goldin should have been on notice that something was amiss with the company's financial situation (especially in light of the favorable market conditions for metal products) as early as July, 1997.  Had Brassco's directors intervened

appropriately, the company may have been able to prevent the losses that accrued in connection with the Red River Commodities deliveries.

**CONCLUSION**

Klipo is liable to Brassco for a total of $340,891.70 in damages. A breakdown is provided as follows:

- $271,265.28 for the amounts outstanding on the agricultural transactions with Marius FT and Intertec Trading plus prejudgment interest in accordance with the dates and the amounts set out in Schedule A appended to this Order and Opinion;

- $11,293.10 for the kickbacks Klipo received in his personal bank account from Chrzan plus prejudgment interest as of October 1, 1997;

- $58,333.33 in disgorgement of salary, which Brassco paid to Klipo for the months of October, November, and December, 1997 (*i.e.,* $ 5,833.33 times three equaling $17,500) and from January, 1998 through July, 1998 (*i.e.,* $ 5,833.33 times seven equaling $40,833.33) plus prejudgment interest as of October 1, 1997 – for the period of time when Klipo received kickbacks from Chrzan and, as well, the term of the Red River Commodities contract.

The Clerk will calculate the prejudgment interest at the aforementioned rate.

The foregoing Opinion and Order constitute the findings of fact and conclusions of law required

by Federal Rule of Civil Procedure 52(a).

SO ORDERED

PAUL A. CROTTY
United States District Judge

Dated:     New York, New York
           January 27, 2006

## SCHEDULE A

## Calculation of Prejudgment Interest[9]

| Transaction | Date of Payment by Brassco to Foodstuffs Suppliers | Amount Not Paid |
|---|---|---|
| 1997 Transaction # 4 | April 22, 1997 | $885.31 |
| 1997 Transaction # 5 | November 10, 1997 | $14,021.16 |
| 1997 Transaction # 6 | December 1, 1997 | $52,600.50 |
| 1997 Transaction # 7 | December 18, 1997 | $52,509.89 |
| 1998 Transaction # 1 | January 21, 1998 | $30,491.06 |
| 1998 Transaction # 2 | February 19, 1998 | $30,189.34 |
| 1998 Transaction # 3 | March 12, 1998 | $30,189.34 |
| 1998 Transaction # 4 | April 9, 1998 | $30,189.34 |
| 1998 Transaction # 5 | July 7, 1998 | $30,189.34 |
| Total | | $271,265.28 |

---

[9] The Court finds that "the earliest ascertainable date the cause of action existed" for purposes of computing prejudgment interest occurred when Brassco paid the foodstuffs suppliers. N.Y. C.P.L.R. § 5001(b). Because damages here "were incurred at various times," the Court directs the Clerk to calculate prejudgment interest "upon each item from the date it was incurred," id., as set out in Schedule A above (see also Trial Ex. 43, at 00000096, 00000137 (setting out amounts and dates when debt from various transactions were incurred)).

41

*Copies Mailed To*:

Robert Wisniewski
Robert Wisniewski & Associates P.C.
225 Broadway Suite 612
New York, NY 10007
212-267-2101
Fax: 212-267-8115

Eugene E. Chmura
14-47 Broadway
Astoria, NY 11106